# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Anthony S., | ) |
|     Plaintiff, | ) ) ) |
| v. | )    No. 18 CV 50220 |
| | )    Magistrate Judge Lisa A. Jensen |
| Andrew Saul, Commissioner of Social Security, | ) ) ) |
|     Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**[1]

In this disability benefits appeal, everyone agrees that plaintiff, who is now 55 years old, has struggled for years in several life domains. A rough biographical sketch establishes this point. Since 2000, plaintiff has not worked at any job for a sustained period, earning only de minimis amounts of reportable income in a few of these years. He has a history of abusing alcohol and crack cocaine, although he allegedly stopped using these substances several years ago. He has had domestic disputes and legal problems. In 2013, he served his most recent prison sentence, a 5-month term for possession of a controlled substance. Dkt. #19 at 2. Over his lifetime, he has been arrested at least 35 times, at least according to his own recollection.[2] He continues to have anger outbursts and problems with authority figures, fearing they are out to get him. Although he claims these problems existed since he was 12 years old, he also states that they were exacerbated in 2009 when his son was shot and killed by Rockford police in a church daycare center. R. 336. For plaintiff, this was a devastating event. Afterwards, he began hearing voices, specifically his son's voice, and became more distrustful and has spent much time

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] Most of the facts in this paragraph come solely from plaintiff's testimony or statements.

1

ruminating about the alleged injustice. He has a history of suicide attempts, the most recent one in 2011, which allegedly led to a three-week stay at a facility. *Id.* at 3. At the time of the administrative hearing, he was living in a homeless shelter. On a brighter note, he got married in 2014. His new wife has diligently been assisting him in pursuing disability benefits.

Although both sides agree on this factual template, they differ on how to best explain plaintiff's life difficulties. Plaintiff offers a psychological or medical explanation. After being released from prison in November 2013, he began treatment at Rosecrance Ware Center. A psychiatrist, Dr. Michael Kuna, diagnosed him with bipolar disorder and post-traumatic stress disorder ("PTSD") and prescribed medications to treat these conditions.[3] Plaintiff also began participating in group therapy. Dr. Kuna completed a mental RFC questionnaire in which he opined, among other things, that plaintiff had marked limitations in several categories, had three episodes of decompensation in a 12-month period, and would likely be absent from work four or more days a month. R. 691, 693. In a nutshell, plaintiff's argument is that his psychological conditions were the root cause of his problems.

The administrative law judge ("ALJ") had a different take. She found that plaintiff was not a credible witness and that Dr. Kuna's opinion was unsupported. Although she agreed at Step Two that plaintiff had severe psychological impairments—including bipolar disorder, PTSD, and personality disorder—the ALJ found that plaintiff still had the ability to do light work. The ALJ offered a series of non-medical explanations to account for plaintiff's dysfunctional periods. The ALJ did not itemize these explanations into a neat list. Instead, these rationales emerged, mostly from the ground up, during the course of the ALJ's lengthy summary of plaintiff's medical visits.

---

[3] In 2017, plaintiff was taking Celexa, Geodon, and Trazodone. R. 688.

Based on this Court's reading of the decision, the ALJ relied on the following rationales or contentions.

First, plaintiff's conditions were fully controlled by his medications. Second, plaintiff's doctors made many "normal" findings during office visits. Third, plaintiff often reported that he was feeling okay. Fourth, plaintiff did activities inconsistent with his allegations, particularly with his claim that he couldn't tolerate being around other people. These activities included sometimes going to his daughter's basketball games; helping to organize a rally to protest his son's killing; living in a homeless shelter; and participating regularly in group therapy. Fifth, plaintiff made inconsistent "presentations" or statements. One prominent example the ALJ relied on was that plaintiff, when interviewed by the consultative examiner (psychologist Dianna Kucera), refused to talk to her or to make eye contact. He let his wife do all the talking. The ALJ believed this behavior was "markedly inconsistent" with his "usual presentation" when seeing his treating doctors. R. 36. Sixth, the ALJ pointed to situational factors to explain certain facts.

Although the ALJ's rationales have an ad hoc quality to them, with no single theory explicitly tying them together, there is a deeper lurking rationale that potentially plays this role. This is the implied accusation of malingering.[4] Although the ALJ never used this term, the ALJ made many statements pointing in this direction. The ALJ referred several times to plaintiff's inconsistent "presentation," a word that seems to be a veiled reference to malingering. The ALJ also noted that plaintiff once advised a case manager at Rosecrance "how to complete the mental health evaluation for [plaintiff's] attorney with answers that would help him gain approval for benefits." R. 37. The ALJ made other general statements alluding to malingering as a hidden

---

[4] *See Carter v. Colvin*, 556 Fed. App'x. 523, 525 n.1 (7th Cir. 2014) ("'Malingering' is defined in the DSM-V as the 'intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs.'").

3

rationale. *See* R. 40 ("there is evidence of a lack of cooperation and/or less than full effort in the record").

To sum up, the Court is presented with two contrasting explanations. One would lead to a finding of disability, the other would not. It is often stated that when there is conflicting evidence about which reasonable minds could differ, then this Court must defer to the ALJ's interpretation so as long as it reasonable. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). However, there are some additional constraints on this general rule.

One is that ALJs should not make "their own independent medical findings," or in more vivid words, should not "succumb to the temptation to play doctor." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Here, the Court finds that the ALJ played doctor in multiple ways, and that a remand is required for this basic reason.

The stage for doctor playing was set by the ALJ's decision (i) to not call a medical expert at the hearing, (ii) to give no practical weight to the opinions of the two state agency opinions, and (iii) to give no practical weight to Dr. Kuna's opinion.[5] Given that there were no supporting medical opinions, the ALJ's analysis necessarily was based on her layperson judgments.

As the Seventh Circuit has noted, the temptation to play doctor is particularly acute where, as here, the claimant has psychological impairments. In a series of cases over the last couple decades, the Seventh Circuit has repeatedly faulted ALJs for having a general "lack of understanding" of complicated impairments such as bipolar disorder, schizophrenia, and PTSD. *See Kangail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006); *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008); *Larson v. Astrue*, 615 F.3d 744 (7th Cir. 2010); *Spiva v. Astrue*, 628 F.3d 346 (7th Cir.

---

[5] The ALJ did give "some weight" to "observations" in Dr. Kucera's report, but as the ALJ noted, Dr. Kucera did not herself offer any formal opinion or diagnosis. R. 42. Therefore, this opinion cannot credibly be relied on to support the ALJ's overall conclusion.

4

2010); *Jelinek v. Astrue*, 662 F.3d 805 (7th Cir. 2011). In these and other cases, the Seventh Circuit has pointed out common fallacies or misconceptions made by ALJs. Although many admonitions could probably be gleaned from these cases, the following are most relevant here.

**Symptoms are often episodic.** The Seventh Circuit has emphasized that ALJs should always consider the possibility that the claimant's symptoms wax and wane. If the claimant's symptoms are episodic, then this may affect other parts of the analysis. One common issue is whether ALJs can rely on normal examination findings to cast doubt on the claimant's credulity. However, as explained in *Kangail*, if symptoms are episodic, then it is not contradictory for a doctor to find that a claimant had a severe mental illness even though she was "behaving pretty normally during her office visits." 454 F.3d at 629. A similar point was made in *Bauer*:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job.

532 F.3d at 609.

**Bipolar disorder is not easy to treat in many cases.** This point is partly related to the first one. In *Kangail*, the Seventh explained that, although bipolar disorder in theory is "treatable by drugs," several factors make treatment more difficult in practice. One barrier is that the claimant "may require a complex drug regimen to deal with both the manic and the depressive phases of the disease." 454 F.3d at 630. Another is that the illness itself "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment." *Id.* For these and other reasons, the Seventh Circuit has cautioned ALJs to be careful in analyzing whether medication will work over an extended period. *See Jelinek*,

5

662 F.3d at 814 ("we have often observed that bipolar disorder [] is by nature episodic and admits to regular fluctuations *even under proper treatment*.") (emphasis added).

**Psychological impairments may be subtly confused with other non-medical issues.** Perhaps another way of making this same point is to say that causation can be tricky. The potential for confusion has arisen in several areas.

One is drug and alcohol abuse. In *Kangail*, the ALJ believed that the claimant's bipolar disorder was caused by her use of alcohol and cocaine. The ALJ reasoned that the claimant would be fine once she stopped using these substances. But the Seventh Circuit rejected this logic: "What is clear is the reverse—that bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms." 454 F.3d at 629.

Another scenario is when an ALJ attributes a claimant's problems to situational factors. In *Larson*, the Government argued that the ALJ had properly found that the claimant's waxing and waning symptoms were being caused by "situational stressors." 615 F.3d at 751. The logic was that, once the stressors were removed by whatever means, then the problems would go away naturally. But the Seventh Circuit questioned this finding, noting that "[n]o doctor concluded that Larson's symptoms were just a response to situational stressors as opposed to evidence of depression." *Id.*

A third area is malingering. In *Spiva*, the ALJ suggested that the claimant was malingering, noting that the claimant was "evasive" and "uncommunicative" during a consultative examination. 628 F.3d at 348-49. But the Seventh Circuit rejected this conclusion, holding that a claimant "being vague or evasive when questioned about his illness could be evidence of malingering, but *equally* could reflect the effects of his

psychotic mentation." *Id.* at 351 (emphasis added). It should be noted that the Seventh Circuit did not hold that the ALJ could never rely on a malingering rationale, but merely that the ALJ should consider these issues more carefully.

**Claimants may lack insight into their condition or be unable to communicate effectively about it.** As one court summarized, "[f]ederal courts have long recognized that, in the context of mental illness, insight can play an important role in evaluating the claimant's credibility; and, by definition, a claimant with poor insight cannot be expected to understand the true nature of his impairments." *Lewis v. Astrue*, 2012 WL 5342669, *7 (N.D. Ill. Oct. 25, 2012). It is not just being able to understand their impairments, but also communicating those understandings to doctors. The Seventh Circuit in *Spiva* explained as follows: "Since [the claimant] is psychotic, his inability to maintain consistency in responding to different medical personnel cannot automatically be ascribed to an intention to deceive." 628 F.3d at 352-53. In *Kangail*, the Seventh Circuit discussed how a bipolar sufferer may lack the self-awareness to realize that she should "submit[] to treatment." 454 F.3d at 630. Of course, these concerns about the claimant's ability to communicate make the analysis more difficult because psychological diagnoses typically rely heavily on self-reports. *See Korzeniewski v. Colvin*, 2014 U.S. Dist. LEXIS 51004, *21 (N.D. Ill. Apr. 14, 2014) ("All diagnoses, particularly those involving mental health conditions, require consideration of the claimant's subjective symptoms.").

\*     \*     \*

Considering these teachings and applying them to the present case, the argument for a remand is straightforward and relatively easy. In reviewing the ALJ's decision, the Court can find little evidence to suggest that the ALJ seriously considered these issues.

7

Start with episodicity. The ALJ never acknowledged the issue. Instead, like the ALJs in *Kangail* and *Bauer*, the ALJ put heavy weight on normal examination findings and positive self-reports without considering whether they coincided with good periods. This is not an obscure or hidden issue. Not only is it featured prominently in the case law, but plaintiff here described his symptoms consistent with such a theory. *See* R. 309 ("Some days I am ok and some days I am not ok."). Plaintiff argues that the ALJ overlooked doctor visits where he reported negative symptoms such as racing thoughts, anxiety, and paranoia.[6] On remand, these issues can be investigated with more rigor, and further detailed findings can be made about the nature and frequency of the alleged fluctuations.

The question of episodic symptoms was also potentially relevant to plaintiff's activities. Most of the activities relied on by the ALJ do not appear to have been done frequently. As such, it is possible that they could have been done when symptoms were dormant. But the ALJ did not consider these questions and arguably gave an inflated impression of how frequent plaintiff's activities were. For example, the ALJ observed that plaintiff "attended [his daughter's] basketball games," a description sounding as if this were a regular outing. R. 27. Perhaps it was, but as plaintiff points out, there was "only one reference to a basketball game" in the record. Dkt. #19 at 10. Similar questions arise regarding the claim that plaintiff, in the ALJ's words, "organized, planned, attended, and participated in numerous community events." R. 27. When stated in this generalized way, this description suggests that plaintiff had an official job as a community organizer and frequently took the lead in organizing events. However, the record,

---

[6] The ALJ's own summary of the record recites evidence supporting plaintiff's theory. *See, e.g.* R. 30 (noting that plaintiff "alleged that his memory was 'pretty good' *with the exception of* days on which he was 'really' depressed") (emphasis added); R. 37 ("He also stated that he stays up for days, has poor motivation, has crying spells, and does not shower every day when depressed."). However, the ALJ repeatedly covered these adverse findings with a blanket, end-of-paragraph summary sentence, such as this one: "Thus, *despite* his subjective complaints, claimant's mental status examination was *generally* normal at the time of the evaluation." R. 30. (emphasis added). These conclusions would benefit from the backing of a medical expert.

8

which is ambiguous, suggests a more limited role. The main piece of concrete information is the following statement: "[Plaintiff] indicated that his pastor wants him to coordinate another walk but [he] was feeling discouraged because only 10 people came to the last one." R. 494. This statement is vague. It is really only proof that plaintiff coordinated one walk. In short, this may have been a one-off or two-off event. Moreover, it's not clear how extensive plaintiff's role was. If only 10 people came, it does not suggest that complicated logistical planning was involved, although the record is too cryptic to reach any firm conclusions. One final observation—the references to community events all appear to be related to plaintiff's deceased son. It is thus possible that the highly emotional nature of this topic impelled him in a type of "heroic effort" that could not be summoned day in and day out on a full-time job. *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005).

As for group therapy, the record provides some support for a finding that this activity was done more frequently than those above. But there is still uncertainty as to how regular it was. The ALJ's unqualified description suggests that plaintiff's participation was uninterrupted and never questioned. *See* R. 27 (ALJ: "The claimant participated regularly, actively, and appropriately in group therapy sessions."). However, the ALJ's own summary of the medical record reveals gaps. *See* R. 32 ("failed to attend or reschedule mental health appointments"); R. 35 ("He also reported that he 'dropped into a grief/loss group' today 'for the first time in a long time.'"); R. 36 (at October visit: "records show there had been a gap in treatment, as claimant had not been seen at Rosecrance since May 2015."). Twice, Rosecrance closed plaintiff's file because he had not been showing up for appointments. R. 32, 36. In any event, even if plaintiff's participation were as regular as the ALJ suggested, there is a question as to whether this would be sufficient to question his credibility. In *Bauer*, the Seventh Circuit faulted the ALJ for relying

9

on, among other things, the bipolar claimant's "active" participation in group therapy. 532 F.3d at 608.

As for the symptoms being "well managed" by medications, this conclusion also fails to reckon with contrary evidence. It is true that plaintiff made some statements indicating that his medications were helping, but there are other statements raising doubts about this thesis. In several instances, plaintiff told doctors that he was doing well, *even though* he had not been compliant in taking his medications. *See* R. 32 ("Although claimant reported that he had been out of his medications for two weeks, he presented with a positive mood and affect."); R. 40 ("Notes indicate that the claimant had been out of medications for more than a month. Nevertheless, the claimant was 'doing well' and had no exacerbation of symptoms."). Of course, this fact could cut against plaintiff by suggesting that he did not need any medication. But it also could be evidence that plaintiff had not achieved a stable solution through medication but was merely riding the natural cyclical ups and downs caused by his impairment or that he was not following his doctors' directions. This is another area in which a medical expert could provide a more fine-grained analysis.

As for the alleged inconsistencies, this finding is perhaps the most damaging because it raises the specter of malingering. As noted previously, the ALJ did not explicitly endorse (or disclaim) a malingering rationale, but she did repeatedly refer to "significant inconsistencies" that were "not entirely reconcilable" or "explainable." R. 31, 40, 42. If the ALJ were covertly accusing plaintiff of malingering, then it would be a serious charge, carrying the potential to "dominate all [other arguments] like the proverbial skunk thrown in the jury box." *Potega v. Berryhill*, 2017 WL 2461549, *4 (N.D. Ill. June 7, 2017).

The ALJ's findings of inconsistency failed to consider the teaching of *Spiva* and other cases stating that psychological impairments may cause malingering-type behavior. Going back to the Kucera interview. The ALJ insinuated plaintiff was posturing when he refused to talk or make eye contact with the examiner. According to the ALJ's interpretation, this behavior raised a "concern over the legitimacy of [plaintiff's] presentation." R. 42. The ALJ thought it was suspicious that plaintiff had never acted this way with his regular doctors or therapists. Plaintiff disputes this point somewhat, noting that there was "at least one other appointment" where he "was irritable" with a case manager. Dkt. #19 at 11. But even if plaintiff's behavior were atypical, it was still arguably consistent with his theory of the case. Plaintiff has stated that he was impulsive and felt paranoid around "authority figures" and feared they were out to get him. He may have viewed Dr. Kucera, who was there only to "evaluate" him, differently from how he viewed doctors who he saw many times and who were helping him get better. The ALJ never considered this possibility.

Although the ALJ used the phrase "additional inconsistencies," suggesting there were many, the ALJ only explicitly identified two or three in addition to the Kucera interview. In fact, the Kucera interview, which could be viewed as an outlier, appears to be the main piece of evidence. The other cited inconsistencies seem relatively minor and would likely disappear if given a charitable reading. *Beardsley*, 758 F.3d at 838 ("To the extent we see any inconsistencies here, they do not rise above trivial matters that the ALJ did not inquire into during Ms. Beardsley's hearing."). For example, the ALJ faulted plaintiff for this inconsistency: "Notably, although claimant reported that all of his mental health problems began with the death of his son, he also reported that he had mental health problems when he was younger." R. 30-31. This is arguably a surface discrepancy, and could be easily resolved by inserting a few qualifiers—for

11

example, change the word "all" to "some" and the statement makes sense. Too often the ALJ's reliance on inconsistencies feels like a game of gotcha.

But more broadly, the Court's concern is not that inconsistencies were found. If an aggressive approach were taken, one might find even more than the ALJ did. For example, although not commented on by the ALJ, plaintiff gave two different descriptions of when he stopped abusing crack. *Compare* R. 30 (most recent use was in April 2011) *with* R. 30 (most recent use was in June 2013). The bigger concern is that the ALJ did not consider the possible reasons for the inconsistencies. The ALJ seemed to assume that they were evidence of malingering. But if plaintiff were faking his symptoms, he did so in an awkward manner. In the Kucera interview, for example, he could have chosen to talk and then simply exaggerated his symptoms. Instead, he went silent. It is not obvious how this helped his case. In sum, the ALJ never considered the possibility that the alleged inconsistencies confirmed plaintiff's disabilities, rather than refuted them.

Another problematic issue is reliance on situational explanations. Throughout the decision, the ALJ reached for non-medical factors to explain away negative symptoms or behavior. These included: the assertion made several times that plaintiff's problems were "primarily" or "largely" "financial"; the claim that plaintiff's poor work history was caused by his criminal record and nothing else; the argument that his problems were all related to his son's death, the assumption apparently being that he would eventually come to terms with this event; the statement that he heard voices only while in prison; and the conclusion that it was the child support dispute that explained plaintiff's anger, and not the other way round. But the ALJ never considered what might be the most obvious explanation, which was that these problems were manifestations of the underlying psychological impairments. The ALJ also glossed over several

seemingly dramatic facts—*e.g.* plaintiff was arrested 35 times and stayed three weeks in a facility after a suicide attempt in 2011. These facts faded into the background.

In considering possible psychological explanations, the Court notes that the ALJ found at Step Two that one of plaintiff's severe impairments was "personality disorder." R. 25. The ALJ never discussed this impairment in any substantive way in the rest of the decision. Also, the ALJ did not specify what type of personality disorder plaintiff had, although the ALJ did at one point refer to it as "antisocial personality disorder." *Id.* According to the Mayo Clinic website, the following "complications, consequence, and problems" may be present when a person has this disorder:

- Spouse abuse or child abuse or neglect
- Problems with alcohol and substance abuse
- Being in jail or prison
- Homicidal or suicidal behaviors
- Having other mental health disorders such as depression or anxiety
- Low social and economic status and homelessness

An argument could be made that every one of these bullet points is applicable here.[7] It is not this Court's role to play doctor in the first instance, but the Court can note that this type of explanation should have at least been considered. The ALJ instead interpreted all these facts against plaintiff. For example, the ALJ believed that plaintiff's living in a homeless shelter proved that he could get along with others. As for his criminal history and the 35 arrests, the ALJ used these facts only to explain why plaintiff had a poor work history, but did not consider that they also might support plaintiff's contention that he had problems with authority figures. At almost every analytical turning point, the ALJ showed no curiosity in the interpretations favoring plaintiff. On remand, the ALJ should conduct a more holistic and longitudinal analysis and at

---

[7] The first paragraph of this Court's opinion summarizes in loose form much of this evidence. Again, it is important to note that this evidence largely comes from plaintiff's recollection and has not been verified in all cases by independent sources, insofar as this Court can tell.

least consider whether these seemingly unrelated surface phenomena were in fact all connected to the root psychological impairments.[8]

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is reversed and remanded for further proceedings consistent with this opinion. At the hearing on remand, the ALJ should call a psychological expert to consider these issues fully.

Date: January 2, 2020        By: _Lisa A. [signature]_
                                                           Lisa A. Jensen
                                                           United States Magistrate Judge

---

[8] Plaintiff raised a few other arguments for remand, some relating to an alleged back problem. But as plaintiff's counsel noted in his opening statement at the hearing, the treatment for the back problem was "sporadic" and the mental health impairments were "the most severe" problem. R. 57. These and any other arguments not addressed herein can be considered on remand. Plaintiff's counsel should explicitly raise them with the ALJ to avoid a finding of waiver in any subsequent appeal to this Court.